UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ERMC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-407-DCP |
| | ) | |
| MILLERTOWN PAVILION, LLC, f/k/a | ) | |
| KNOXVILLE PARTNERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| SECURAMERICA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-408-DCP |
| | ) | |
| MILLERTOWN PAVILION, LLC, f/k/a | ) | |
| KNOXVILLE PARTNERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

These cases are before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 15].

These consolidated matters came before the Court on March 16, 2021, for a bench trial conducted via videoconference. After the bench trial, both parties filed their Proposed Findings of Fact and Conclusions of Law [Docs. 63 and 64], which the Court has considered. Accordingly, for the reasons further explained below, the Court **FINDS** that judgment will be granted in favor of Plaintiff ERMC, LLC, in the amount of $439,746.63, and in favor of Plaintiff SecurAmerica in the amount of $503,907.27, in addition to reasonable attorney's fees.

## I.    BACKGROUND

The Complaints in these consolidated matters allege that Defendant breached certain service contracts with Plaintiffs by failing to pay the amounts due thereunder.[1]  Plaintiffs seek to recover money damages allegedly owed to them pursuant to two contracts for services, which were assigned to them by non-party TriState Security of America, LLC ("TriState") with the consent of Defendant.  [Doc. 51 at 2].

The Court found that there were genuine issues of material fact which precluded Plaintiffs' Joint Motion for Summary Judgment [Doc. 51], and as mentioned above, the case proceeded as a bench trial on March 16, 2021, via videoconference.  The Court will summarize the testimony below.

## II.   EVIDENCE

The Court will summarize Plaintiffs' evidence and then turn to Defendant's evidence.

### A.    Plaintiffs' Evidence

Plaintiffs presented the live testimony of John Maynord ("Maynord"), Chief Financial Officer ("CFO") for ERMC, LLC[Doc. 59 at 10].  ERMC, LLC ("ERMC") is a series of companies, which are a part of the Argenbright Group.  [*Id.*].  Maynord explained that Plaintiffs ERMC and SecurAmerica, LLC ("SecurAmerica"; together "Plaintiffs") are sister entities under the Argenbright umbrella.  [*Id.* at 11].  Maynord testified that he was hired into the ERMC family of companies as CFO in 2014 when he joined the legacy ERMC business–TriState.  [*Id.* 11–12].  Maynord detailed that ERMC and SecurAmerica are facility services companies, with

---

[1] The Court consolidated the cases [Doc. 17] on January 29, 2020, after the parties requested consolidation due to the common issues of law and fact presented in both cases.  The Court designated *ERMC, LLC, v. Millertown Pavilion, LLC*, No. 3:19-CV-407 ("*ERMC* Case") as the lead case and noted that filings should be made only in the *ERMC* Case.  Thus, all citations herein will be made to the *ERMC* Case, unless otherwise noted.

SecurAmerica being strictly a security guard provider of service while ERMC provides facility services consisting of custodial maintenance and landscape services. [*Id.* at 12].

As CFO, Maynord testified that he was familiar with the companies' payroll, billing, and contractual-based processes, including that of TriState when it was a member of the ERMC family. [*Id.*]. He explained that Knoxville Partners, LLC and TriState entered into a facilities agreement ("Facilities Agreement") for janitorial and maintenance services for the Knoxville Center Mall ("Mall") on October 7, 2016. [*Id.* at 13; Exh. 1]. In exchange for services rendered pursuant to the Facilities Agreement, Defendant agreed to pay TriState $300,830.25 per year for janitorial services and $121,344.26 for maintenance services. [*Id.* at 16; Exh. 1 at ¶ 2; Exh. 1–A]. Under the agreement, Defendant was expected to pay monthly following a statement or invoice. [*Id.* at 17].

Maynord further explained that pursuant to paragraph 10 of the Facilities Agreement, the property owner had certain remedies in the event of the contractor's failure to perform including, (1) notify contractor of any deficiency in contractor's performance and provide reasonable time for correction, (2) obtain an alternative contractor to perform the services or remedy contractor's deficiency, or (3) terminate the agreement effective immediately upon notice to contractor. [*Id.* at 18]. He testified that since 2014, he has not been aware of any instances in which TriState or ERMC were provided notice of deficiency or of instances in which Defendant employed an alternative contractor to perform the janitorial and maintenance services under the Facilities Agreement. [*Id.*]. He also stated that he was unaware of any instance in which Defendant provided any notices of termination of the Facilities Agreement to either TriState or ERMC. [*Id.* at 19].

In terms of other provisions appearing in the Facilities Agreement, Maynord testified that there is an attorney's fee provision in paragraph 18(d) providing that the losing party in any action

or proceeding commenced in connection with the agreement shall reimburse the prevailing party for the reasonable attorney's fees and expenses incurred in prosecuting or defending the action. [*Id.* at 19–20]. In addition, there is a provision providing that any modifications to the agreement are required to be in writing signed by all parties or successors. [*Id.* at 20].

Turning to the Exhibits to the Facilities Agreement, Maynord explained that Exhibit A not only set out amounts to be paid annually by Defendant, but also included categories of amounts allowed to be charged to Defendant, including supplies and fuel. [*Id.* at 20]. He stated that the terms for those charges were cost plus 10% and that they applied to both janitorial and maintenance services. [*Id.*]. Maynord detailed that Exhibit B established the scope of service for janitorial services to be provided under the agreement, while Exhibit C established the scope of service for maintenance services. [*Id.* at 21]. He noted that he was not aware of any signed writing modifying either Exhibit B or C. [*Id.*]. Lastly, Maynord reviewed Revised Exhibit A,[2] dated November 4, 2016, which he explained revised the original Exhibit A to increase the amount of the billing for the janitorial services and increased the number of hours, with maintenance remaining unchanged. [*Id.* at 21–22].

Maynord then reviewed the security service contract between Knoxville Partners, LLC and TriState ("Security Agreement"), which was entered into on October 7, 2016, along with the Facilities Agreement.[3] [*Id.* at 23; Exh. 2]. Maynord testified that aside from describing different services, the Facilities Agreement and the Security Agreement were very similar with respect to the terms and conditions of the contractual provisions. [*Id.* at 24]. Paragraph 1 outlined that

---

[2] This was oftentimes referred to as "second Exhibit A" during Maynord's testimony; however, for ease of reference, the Court will refer to this document as "Revised Exhibit A."

[3] The Facilities Agreement and the Security Agreement are sometimes collectively referred to as the "Service Contracts."

security services were to be provided. [*Id.*]. Paragraph 2 addressed compensation, referencing that sums to be paid are set forth in Exhibit A to the Security Agreement. [*Id.* at 25]. Reviewing Exhibit A, Maynord identified that $341,653.03 per year was to be paid annually for the security services. [*Id.*]. He also confirmed that in the event of a deficiency, paragraph 10 of the Security Agreement described the same three remedies contained in the Facilities Agreement. [*Id.* at 25–26]. Maynord testified that he was unaware of a notice ever having been provided by Defendant to either TriState or SecurAmerica regarding any performance deficiency under the Security Agreement. [*Id.* at 26]. Further, he was unaware of Defendant having obtained any alternative contractors to perform the security services or to remedy any alleged deficiencies or of any notices of termination having been sent by Defendant to either TriState or SecurAmerica regarding the Security Agreement. [*Id.*]. Maynord also confirmed that paragraph 15, which required any modifications to be in writing signed by all parties, and the attorney's fee provision in paragraph 18(d), were consistent with the previously discussed provisions in the Facilities Agreement. [*Id.*].

Addressing the Exhibits to the Security Agreement, Maynord stated that in addition to the annual costs for security services previously discussed, Exhibit A allowed fuel at cost plus 10% to be charged to Defendant, noting that there typically are no supplies for security services. [*Id.* at 27]. Exhibit B established the scope of service for janitorial services to be provided under the agreement, with no written amendments having been signed by the parties. There was also a Revised Exhibit A to the Security Agreement, dated November 4, 2016, which reduced the hours as well as the billing on an annual basis from $341,653 to $326,712. [*Id.*].

Next, Maynord provided testimony concerning the Assignment and Assumption Agreement ("Assignment"), dated November 17, 2017, and corresponding redacted copy of the Asset Purchase Agreement ("Purchase Agreement") of the same date. [*Id.* at 28 and 30; Exh. 3].

He explained that TriState assigned all right, title, and interest in the Facilities Agreement to ERMC and assigned the Security Agreement to SecurAmerica.  [*Id.* at 30–31].  He further explained that any amounts that were already past due and owing, or accounts receivable, were included as part of the acquired assets in the Purchase Agreement, but that they were distributed only to SecurAmerica.  [*Id.* at 31–32].  Maynord clarified that "because of a function of the constraint within the system," the accounts receivable "had to be assigned to a single job within SecurAmerica," and so, even if janitorial and maintenance billed amounts were due and owing as of the time of the assignment, they were reflected on SecurAmerica's books rather than ERMC's.  [*Id.* at 32-33].  He continued, however, that for amounts incurred or billed after the assignment, those related to security would have been reflected on SecurAmerica books, while those related to janitorial and maintenance would have been reflected on ERMC's.  [*Id.* at 33].  Maynord testified that after the Assignment and Assumption Agreement and Purchase Agreement went through, ERMC and SecurAmerica began performing services for Defendant under the respective agreements.  [*Id.*].

Maynord also reviewed the consent to assignment, dated November 29, 2017 ("Consent Letter"), which was executed by Defendant.  [*Id.* at 34; Exh. 4].  He stated that under the terms of the contract, an assignment had to be consented to by the customer and that the consent explained that TriState had agreed to sell substantially all of its assets to SecurAmerica and its affiliates, which would have included ERMC.  [*Id.* at 34–35].  Exhibit A to the Consent Letter referenced the two agreements being assigned as the Facilities Agreement and the Security Agreement.  [*Id.* at 35].  Maynord went on to explain that paragraph 3 of the Consent Letter promised a reduction in the total monthly fees from $60,000 to $45,000 per month[4] for both the janitorial/maintenance

---

[4] Maynord noted that the amounts were rounded approximations, "very close to the billing subsequent to the assignment."  [*Id.*].

and security services. [*Id.*]. He stated that the fees for the Facilities Agreement were reduced by about $21,000 and that the fees for the Security Agreement were reduced by about $5,000, noting that the impetus for the reduction was a request from the customer. [*Id.* at 37].

On May 1, 2018, a Change Order was executed by ERMC and Defendant to reduce the scope and the billing for janitorial services only, reducing the billing from $19,327 to $15,195 per month. [*Id.* at 38; Exh. 5]. Maynord again noted that the reduction was to accommodate the customer's request, but he pointed out that Defendant had not been paying for these services at any point after December of 2017. [*Id.* at 39].

Maynor testified that by letter dated August 29, 2019, Defendant was provided with a notice of termination of the Facilities Agreement and the Security Agreement, informing Defendant that services would terminate on September 29, 2019. [*Id.* at 40; Exh. 6]. He stated that services were terminated on that date. [*Id.*]. Maynor further testified that Plaintiffs performed their obligations under the Facilities Agreement and the Security Agreement and that the services were performed in a professional, timely, and in a conscientious manner. [*Id.* at 41].

With regard to billing, Maynord stated that Defendant was invoiced for the services monthly, both by TriState and later by Plaintiffs. [*Id.* at 42]. He testified that payments were made on the invoices for November of 2017 and December of 2017 and that there were some instances of partial payments. [*Id.*]. Maynord reviewed Defendant's statement of account dated December 31, 2019, from SecurAmerica ("SecurAmerica ledger"), detailing the remaining outstanding amounts for each unpaid invoice, which reflected a total balance of $505,152.35. [*Id.* at 42–44; Exh. 7].[5] He testified that it was an accurate portrayal of the amounts due and owing,

---

[5] Maynord later clarified in his testimony that the repeated dates of 11/30/18 reflected on the SecurAmerica ledger [Exh. 7] was due to when data was imported into a new ERP system. He stated that everything entered that system with an 11/30/18 date because that was the point when the new system went live and that the ledger was generated from that system. [*Id.* at 56].

except for a $1,200 discrepancy that had been discovered. [*Id.* at 45]. He also confirmed that the SecurAmerica edger included two invoices that were previously sent by TriState for janitorial and maintenance service, but that were included because of the accounts receivable function previously discussed, as well as TriState invoices for security services that were rolled over. [*Id.*].

In reviewing the individual monthly invoices, Maynord stated that they aligned with the SecurAmerica ledger. [*Id.* at 45; Exh. 8]. He also noted that the payment terms were net 15. [*Id.* at 47]. Maynord specifically reviewed Invoice No. 06967, dated September 30, 2017, which included services performed in the month of September, with payment due October 15, 2017. [*Id.*]. He noted that on the ledger, the amount reflected is $34,182.37 while the invoice reflected $36,470.33, resulting in a discrepancy, which he attributed to a partial payment.[6] [*Id.*]. He further explained that the fuel expenditure of $328 shown on the invoice included the actual fuel expenditure plus 10% and that a separate supplies invoice was attached to each monthly service invoice, which detailed the cost of supplies with the 10% markup. [*Id.* at 48–49].

In reviewing Invoice No. 06967 for September 2017 against the Facilities Agreement prior to the assignment and prior to the reduction from the Consent Letter, Maynord testified that the amount billed of $36,470.33 was calculated under the original Exhibit A and was underbilled by TriState. He explained that using calculations under Revised Exhibit A to the Facilities Agreement, janitorial services would have been billed for $30,000[7] and maintenance would have been billed at approximately $10,000 for a total billable amount close to $40,000. [*Id.* 49–50].

---

[6] Maynord clarified that the $36,000 was the actual amount due and correctly billed, prior to the partial payment. [*Id.* at 49].

[7] Maynord calculated the estimated monthly amount of $30,000 for janitorial services by rounding the annual amount noted on Revised Exhibit A to the Facilities agreement to $356,000 and dividing by 12.

8

Neither SecurAmerica nor ERMC tried to adjust this invoice following the assignment from TriState. [*Id.* at 50].

Next, Maynord reviewed Invoice No. 07004, which billed for October 2017 security services in the amount of $28,471. [*Id.* at 51]. He explained that the amount billed was based on the original Exhibit A rather than the Revised Exhibit A, resulting in a $1,200 overbilling discrepancy, which SecurAmerica was not seeking in its demand. [*Id.* at 51–52]. He then noted a second underbilling in the amount of $4,000 under Invoice No. 07034 for janitorial and maintenance services in October 2017. Maynord summarized that there were two underbillings of collectively $8,000, which SecurAmerica had never attempted to recoup, and one overbilling of $1,200, for which SecurAmerica is lowering its demand. [*Id.* at 52]. Finally, with respect to Invoice No. 07034, Maynord noted that the line-item descriptions for fuel and supplies appearing on the invoice are flipped and that the line described as fuel is actually supplies, and the line described as supplies is actually the fuel charge, but that the total amounts are correct. [*Id.* at 53].

Turning to Invoice No. 07188, sent by SecurAmerica for security services for January 2018, Maynord testified that it was the next invoice occurring on the ledger after the October 2017. He explained that after the October 2017 invoice, there were no invoices for November or December 2017 on the ledger because they were paid through a series of partial payments. [*Id.* at 54]. He reviewed that the payment terms for the invoice were net 15 so that the payment would be due the middle of February. [*Id.*]. He stated that a partial payment was made, and currently $13,944 remains outstanding. [*Id.* at 54–55]. Maynord confirmed that the $20,616.62 reflected as billed was in line with that agreed to in the Consent Letter. [*Id.* at 55].

Maynord further testified that he had reviewed the other twenty-one invoices listed on the SecurAmerica ledger, that the same process was employed for preparing those invoices that was

used for the January 2018 invoice, and that they were accurately billed and reflected in the ledger. [*Id.*]. He stated that the amount owed to SecurAmerica was established by taking the amount reflected in the ledger and subtracting the approximate $1,200 overbilling discrepancy. [*Id.* at 55–56].

Maynord also reviewed the open outstanding invoices for ERMC pertaining to janitorial and maintenance services ("ERMC ledger"). [*Id.* at 57; Exh. 9]. The ERMC ledger is dated December 31, 2019, and Maynord noted that it similarly contains a significant number of 11/30/18 dates due to the ERP system conversion, which loaded all history as of that go-live date into the new system. [*Id.* at 58]. The corresponding janitorial and maintenance invoices begin in January 2018. [*Id.*; Exh. 10]. Maynord explained that all outstanding invoices of TriState as of the consent and purchase by ERMC were included in the accounts receivable transferred to SecurAmerica, but that the November and December invoices were subsequently paid through a series of partial payments, leaving only a remaining balance of $5,000 on the January 2018 invoice. [*Id.* at 58–59]. He further testified that he reviewed the remaining invoices and confirmed that each invoice reflected in the ledger is included in Exhibit 10. [*Id.* at 60]. Maynord also confirmed that the total amount noted as due and owing as reflected in the ERMC ledger [Exh. 9] is $439,746.63 with no discrepancies to note[8] and with no payments having been received since the ledger was created. [*Id.* at 60–61 and 69].

Maynord then identified the process relating to the accuracy of the ERMC invoices. For the January 31, 2018 Invoice No. III-0063653 [Exh. 10], Maynord reviewed that the invoice was billed to Defendant, that the payment terms were net 15, and that the amount billed, $19,327.68

---

[8] Maynord noted that a credit was applied to correct the April invoice on Exhibit 9, explaining that a credit in the amount of $22,312 was issued against the original invoice of the same amount in order to zero out a mistaken amount related to the winding up of the services, which ceased on September 29, 2019. [*Id.* at 61–62].

for janitorial and $5,055.70 for maintenance, were the amounts rebilled following the Consent Letter. [*Id.* at 63]. He further noted that the invoice included amounts for supplies and fuel, each with the addition of 10%, and that the amount for supplies was accurately reflected in the underlying supplies invoice. [*Id.* at 63–64]. Again, acknowledging that partial payment had been made, Maynord confirmed that the final balance for the January 2018 invoice was $5,000. [*Id.* at 65]. Regarding the February 2018 Invoice No. III-0064014, Maynord reviewed that it did not include a charge for supplies because there would not have been a supply invoice from the supplier that month, which occasionally occurred. [*Id.* at 65–66]. He confirmed that invoice did include a fuel reimbursement charge of $291.18, which reflected actual fuel cost plus 10%, and that Defendant had made no payments on this invoice. [*Id.* at 66].

Maynord similarly reviewed the March 31, 2018 Invoice No. III-0064406 and confirmed that the same process was followed for recording of the fuel and supplies costs and that Defendant had made no payments on the invoice. [*Id.* at 67-68]. He then discussed the May 2018 Change Order and testified that it reduced the janitorial fees from approximately $19,000 to $15,000 per month. [*Id.*]. Maynord confirmed that the amounts billed in the May 31, 2018 Invoice No. III-0065199 complied with the terms of the Change Order and that Defendant had made no payments on the invoice. [*Id.* at 68]. He further confirmed that the same process was used throughout to create each of the other 18 invoices included within Exhibit 10 that were billed to Defendant, with no inaccuracies or discrepancies to note. [*Id.* at 69].

After reviewing the SecurAmerica and ERMC ledgers, Maynord testified that the collective amount of damages being sought was calculated by adding the amounts identified in both ledgers and then deducting $1,246.08, the amount of the referenced overcharge, which would

11

result in damages to SecurAmerica in the amount of $503,907.27.[9]  [*Id.* at 71].  He further testified that Plaintiffs had incurred attorney's fees in the prosecution of this matter that would continue until the matter concludes, but that such amounts were not reflected in the amount of claimed damages.  [*Id.* at 71].

On cross-examination, Maynord clarified that prior to the assignment that occurred in November 2017, he was the CFO of TriState.  [*Id.* at 75].  When the assignment occurred, he was the CFO of ERMC, which included the management of the security services at issue under the legal entity SecurAmerica.  [*Id.*].  He confirmed that he had spoken with Rick Hauser ("Hauser"), Defendant's representative, concerning the collection of outstanding amounts, but that he did not recall Hauser complaining about services provided.  [*Id.* at 77–78].  He stated that he did not know for certain whether Defendant ever complained about services Plaintiffs provided.  [*Id.* at 78].  Maynord detailed that Eddie Camp ("Camp") was Plaintiffs' regional manager in charge of all mall services that were provided per the contracts at issue, and that Camp reported to Matt McFarland, both of whom were still employed by the company.  [*Id.* at 79].  Maynord further reviewed Exhibit 12, Responses to Defendant's First Set of Interrogatories, Question 7, which stated that the turnover rate was high in janitorial and unarmed security service jobs, and he agreed that turnover potentially affects the quality of services being provided.  [*Id.*  80-81].  He also stated that it was a possibility that some employees were terminated because they did not do their job correctly or show up for their job.  [*Id.* at 81].  In reviewing Exhibit 13, Interrogatory Responses by SecurAmerica, Question 7, Maynord confirmed that it was the same question just reviewed on the ERMC responses and that the same answer would apply.  [*Id.* at 82].  He clarified that for both

---

[9] While Maynord referenced how collective damages for both ERMC and SecurAmerica were calculated, he did not specially review ERMC's claimed damages totaling $439,746.60 at this point in his testimony.

interrogatory responses, the notation that data files had been corrupted in their present state applied strictly to time keeping and the employees, and it was his belief that such corruption only affected time entries for employees and not the billing system, which was a fixed, flat-rate billing. [*Id.* at 83–84]. He added that the files of employees' time and financial records are kept on different systems and servers. [*Id.* at 86–87]. Maynord further clarified that as of the date of the transition or changeover in the ERP system, there were no issues with the transfer of information, only limitation in some of the presentation of dates. [*Id.* at 84–86].

Finally, Maynord was questioned about what portion of the total estimated $945,000 of claimed damages related to a TriState receivable that was assigned to either ERMC or SecurAmerica. [*Id.* at 87]. He stated that he believed it was less than $100,000 because there were only two or three invoices outstanding at the time of the sale. [*Id.* at 87–88]. Maynord was also asked about his knowledge of a separate lawsuit by TriState against Defendant seeking $257,000 and whether that could be part of the same amount being sought in the instant case. [*Id.* at 87–88]. Maynord testified that he had no knowledge of the separate lawsuit, but that it would not be the same amounts involved. [*Id.*].

### B. Defendant's Evidence

The Court will summarize Defendant's evidence in the order it was presented at the trial.

### 1. Brant Enderle

Brant Enderle ("Enderle") testified via videoconference from Bonita Springs, Florida. He stated that he is a minority owner of Defendant and that he lived in Knoxville, Tennessee, in November 2016. [*Id.* at 91].

Enderle testified that in August 2016, Defendant purchased the Mall from Simon and that at that time, janitorial and maintenance services were employed by Simon. [*Id.* at 92]. He

13

explained that he was involved in discussions to hire TriState because it had a good reputation, the price was better, and he knew of TriState from Chattanooga where he had other minority property ownerships, though he was unaware of whether those properties had used TriState. [*Id.* at 92–93]. Enderle stated that he knew Emerson Russell was the primary principal in charge of TriState and that TriState began providing services at the Mall in October 2016. [*Id.* at 92–93].

Enderle recalled the assignment of the service contracts to Plaintiffs in November 2017 and stated that he signed off on the approval of the assignment. [*Id.* at 93–94]. He did not often deal with issues concerning the Mall, estimating no more than a few times a month because most of the people who worked for him handled the issues. [*Id.* at 94]. Enderle identified Dana Feneck ("Feneck") as the person primarily responsible for the Mall, who focused on operations and budget, while Patrick King ("King") focused on leasing and customer problems and issues. [*Id.*]. He also noted that Laura Severs ("Severs") was employed as the Mall manager when the Mall was purchased from Simon and that she stayed in place for some extended time after Defendant bought the Mall. [*Id.*].

When asked about whether there were every any issues with services provided by ERMC and SecurAmerica, Enderle testified that on several occasions Chick-fil-A and operators of the Japanese steakhouse were upset about the cleanliness of the food court and restrooms and that on several occasions, there were security issues published in the newspaper and on television, which created problems with tenants due to customers not wanting to go to the Mall for fear of security issues. [*Id.* at 95]. Specifically, with respect to Chick-fil-A, Enderle explained that it was the largest anchor tenant in the food court and that it was unhappy with ERMC's responsibility for the cleanliness of the bathrooms and tables in the food court area as Chick-fil-A was charged for that service along with the other tenants. [*Id.*]. He stated that Chick-fil-A had many discussions with

King about its desire to break the lease because the area was not kept clean as expected to be. [*Id.*].

Enderle noted that these issues were passed along to Plaintiffs by Feneck and King, who had many discussions and meetings. [*Id.*]. He later provided testimony that Chick-fil-A was a significant contributor to Defendant's rent, approximately $100,000 per year, and that it was a "big driver of customers" because many people went to the Mall specifically to go to Chick-fil-A, which also helped the other food court tenants. [*Id.* at 96–97].

With respect to security issues, Enderle testified that specific incidents were well documented in incidence reports, but that he mainly remembered those relating to vandalism of vehicles and some fights on the property, with those reported in the newspaper and on television being most problematic because of the reaction with mall-goers and customers. [*Id.* at 96]. He stated that at that time, they were actively trying to find new tenants, such as Burlington Coat Factory, and "all those sorts of things are big negatives for making that happen." [*Id.*].

On cross-examination, Enderle testified that concessions had to be made to keep Chick-fil-A as a tenant, although he could not remember all of them. [*Id.* at 98]. He stated that they were constantly working with Chick-fil-A and the Japanese steakhouse, to which they also made many concessions. [*Id.*]. He added that tenants such as Game Stop and others were very concerned about the security at the Mall. [*Id.*]. While noting that security problems will influence the decisions of tenants and prospective tenants, he could not definitely say that services provided by Plaintiffs were the reason Burlington did not become a tenant. [*Id.*].

Addressing the security detail, Enderle agreed that none of the security personnel were armed and stated that their role was to remove people who were not acting appropriately. [*Id.* at 99–100]. He added that security personnel also should have been in the parking lot to have observed car vandalism activity as they were hired to patrol and observe the parking lot. [*Id.* at

15

100]. While Enderle stated that he had tenants leave in droves, when asked about any evidence establishing that they left because of ERMC's services, he replied that he did not have any in his possession, but that he was sure there was plenty of negative correspondence with them about the issues. [*Id.* at 101].

After reviewing the Failure to Perform terms of the contracts, Enderle was asked whether Defendant availed itself of any of the three options outlined for a failure to perform. Enderle responded, "I know we notified them many times of failure to perform, but I don't have the records." [*Id.* at 102]. He added that he would have no idea whether the notice was provided by certified mail, or in any specified form, as described in paragraph 14 of Exhibit 1, captioned Notices. [*Id.* at 102–103]. Finally, when asked if the lack of payment that occurred from September 2017 through September 2019, with the exception of partial payments in November and December 2017, were based on the vandalism to vehicles, complaints of Chick-fil-A, or news broadcasts, Enderle responded that he did not control payments in 2018 or 2019, so he could not speak to that. [*Id.* at 104].

### 2. Dana Feneck

Feneck testified by videoconference from Cumming, Georgia. Prior to his retirement in December 2017, Feneck was employed by one of Enderle's entities, Alliance PSC, which handled all the payroll. [*Id.* at 107-108]. Feneck explained that he worked on the Knoxville Mall project for Enderle, including the acquisition of the Mall by Defendant and the initial contracts with TriState for maintenance, janitorial, and security services. [*Id.* at 108].

At the time of acquisition of the Mall in May or June of 2016, Feneck stated that they were not happy with the security operation offered by Universal Security Services. [*Id.*]. They were aware of ERMC through other properties they owned in Chattanooga, and they contacted ERMC

to initially provide security services to the Mall, which was expanded within 30 days to include janitorial services and maintenance. [*Id.* at 108–109].

Specifically addressing janitorial services, Feneck testified that ERMC did a good job in the first thirty to sixty days, but then he noticed a deterioration in the continued maintenance, starting with the food court area. [*Id.* at 109]. He stated the deterioration resulted in complaints from the Chick-fil-A manager, Tim Toms, about dirty tables and trash cans not being emptied as well as from his own personal observations from his visits to the Mall. [*Id.*]. Feneck added that the entrances were not being attended to very well and that the main mall entrance on the lower level had bird droppings all around it and gum on the concrete, which gave the impression that it was not clean. [*Id.* at 109–110]. He also stated that trash cans near the front entrance were not emptied and therefore trash would blow around. [*Id.* at 110]. Feneck testified that he had meetings with Mall manager Severs, which would include walking around the Mall and pointing out items to be addressed such as things not functioning well, listing as examples a drippy faucet in the bathroom and towels overflowing the bathroom trash can. [*Id.*].

Feneck next addressed maintenance services such as lights and alarms, identifying that there were about 84 light standards in the parking lot to illuminate the entire lot. [Id.]. He explained that both security and maintenance were supposed to monitor the lights and advise if they were burned out. [*Id.*]. Feneck testified that it took a lot of prompting from him to Severs to get with the janitorial staff about the list of lights so they could be acted upon. [*Id.* at 111]. He also mentioned that there were 15 poles supporting the movie theatre canopy at the upper-level entrance that he tried to get painted, but noted that there was always an excuse as to why they could not get to it, which became very frustrating over time. [*Id.*].

17

Turning back to janitorial services, Feneck stated that there were a lot of restrooms in the Mall, which was a constant issue. [*Id.* at 111]. He testified that he occasionally spoke to Eddie Camp, who was the regional person in charge, but typically his interactions were with the mall management. [*Id.* at 112]. He added that staff was changing all of time except for Nole (last name unknown), a prior employee of the Mall, who ERMC put in charge of janitorial work, and Bobbie Rivera for SecurAmerica, who had also been previously in charge of the onsite security operation. [*Id.*]. Feneck also mentioned a fight that occurred on May 10, 2017, in the food court, recalling that he received a report the following day from the Mall manager. [*Id.*]. He stated that the description of the altercation alarmed him and that tenants were sending videos that had been posted on Facebook and other places showing the fight, which "looked pretty severe and substantial." [*Id.* 112–113]. After noting that the reports he received from Laura Severs, which were signed by the security officers and "pretty bland by comparison," Feneck asked that "somebody further upstream at ERMC" look into the matter, and Camp was notified. [*Id.* 113]. Feneck stated that the event occurred on a Wednesday, and he did not hear anything from senior management until the following Tuesday, which he felt was not good enough. [*Id.*]. Feneck then contacted chief operating officer, Matt McFarland, and asked for a thorough investigation of the matter and discussion of "what kind of steps are going to be taken by security to improve stuff." [*Id.*]. Two weeks later, around May 25, Feneck received an email from Frank Mongeon, who told Feneck that he had talked to the staff onsite and that they were going to have them follow the code of conduct posted at the entrance to the mall stating that teenagers cannot run in the mall, make noise, or have fights.[10] [Id. at 113-114]. Feneck testified that he had expected a little bit more,

---

[10] The parties did not specifically identify Mongeon, but it appears to the Court that he was employed by Plaintiffs.

but that was the response after two weeks of trying to get someone to react, and he found that frustrating. [*Id.*].

Feneck went on to testify that it was important for the Mall to have professional security, maintenance, and janitorial services. [*Id.* at 114]. He explained that in renting space in the Mall, the tenants were very concerned about their customers' safety and security as well as the cleanliness. [*Id.*]. He stated that they obviously paid attention, but the tenants would "sensitize us to it if we were not diligent enough in that regard." [*Id.*]. Feneck testified that they started hearing from the major tenants, particularly those in the immediate food court area. [*Id.*]. He stated that in order to keep tenants, it was important to make sure that there were clean and orderly places where people felt safe. [*Id.*]. When asked about any discussions with either of Plaintiffs regarding reduction of services or further modification of the contract, Feneck explained that in March 2017, malls in general were losing tenants as were they, so they decided to close off the upper level on the Sears' end of the Mall to reduce activity and make it look less empty. [*Id.* at 114-115]. He stated they notified ERMC that they needed to reduce costs and were targeting about $45,000 a month.[11] [*Id.* at 114–115]. Though they first talked about the reduction in March, Camp did not have communications with Feneck until November when Camp advised that they were trying to get to the reduction request and also referenced that ERMC was trying to do an assignment. [*Id.* at 116]. Feneck further explained that in his email communications with Camp, it was discussed that the implementation of the reductions would have to wait until after the Black Friday events, happening the Thursday after Thanksgiving. [*Id.*]. Feneck noted that this communication was

_____

[11] The Transcript reflects that Feneck's testimony was "$45,000 a week," but whether Feneck misspoke or there was a transcription error, it is obvious from the context of the Service Contracts, he meant "$45,000 a month." *See* [Doc. 59 at 115].

about thirty days before he was leaving his responsibilities with the Mall, so he did not know whether "they ever really got to it." [*Id.*].

On cross examination, Feneck clarified that his communications with Camp were largely based on the security incident at the food court and that the janitorial issues with the food court were generally communicated with Severs, who would communicate with ERMC. [*Id.* at 117]. Feneck stated he was unaware of how Severs provided notice of the sanitation issues. [*Id.*]. While Feneck was aware of the contracts that were in place at the time, he did not recall specifically that notice of any issues underlying those contracts needed to be communicated with Plaintiffs in writing. [*Id.* at 117–118]. He confirmed that there were a number of deficient sanitation issues that fell below what was required under the contract. [*Id.* at 118]. However, Feneck was unaware of the unpaid invoices between November 2017 and September 2019 due to leaving his responsibilities in December 2017. [*Id.*]. Feneck testified that he did not object to any of the invoices submitted by ERMC other than they had not achieved the $45,000 a month target budget that he and Camp had agreed to starting in March 2017. [*Id.*]. He noted that he expressed to Camp and Severs in emails that they needed to get to a $45,000 monthly expense overall and that he wanted Camp and others at ERMC, including Nole, who was the onsite guy in charge, to detail what activities were going to be stopped as he did not expect them to do the same stuff and get paid, but rather expected them to do less. [*Id.* at 118-119]. Feneck reiterated that the conversations with Camp began in March 2017 but that by November 2017, the implementation of the changes that would get them to $45,000 would wait until after Black Friday. [*Id.* at 119]. He further stated that he was not familiar with the November 2017 Consent Letter reducing the service. [*Id.*].

Regarding security issues, at the food court, Feneck testified on cross examination that

20

SecurAmerica personnel typically observe and report and do not have "arrestability." [*Id.* at 119-120]. Specifically concerning the report of the May10, 2017 incident in the food court, Feneck elaborated that it was insufficient in that it lacked detail, and they had failed to properly interview witnesses. [*Id.* at 120]. He stated that he was gathering more information from tenants who were witnesses of the incident than he got from security staff. [*Id.*]. When asked whether he considered increasing security services after the incident, Feneck responded, "No. I wanted them to do what they're supposed to do which is have somebody stationed in the food court as had been talked about in their procedures to us." [*Id.*]. He stated that there was some correspondence to the effect that people would be stationed there, but as he recalled, during the time of the food court altercation, the person in charge of that area had been on break for more than an hour. [*Id.*]. Feneck does not maintain that SecurAmerica failed to provide the number of required hours under the Security Agreement. [*Id.* at 121].

### 3. Richard Hauser

Richard Hauser ("Hauser") appeared via videoconference from Minneapolis, Minnesota and served as Defendant's representative during trial. [*Id.* at 122]. One of his entities is the majority owner of the Mall, which was purchased in August 2016. [*Id.* at 123]. At that point, he recalled that Emerson Russell provided the security, janitorial, and maintenance services, but stated that his partners in Knoxville handled that as he did not handle the management of the Mall. [*Id.*]. He confirmed that at some point those services were assigned to Plaintiffs. [*Id.*]. Hauser testified that he has never been involved in the day-to-day operations as his primary job has been the financing and repositioning of the Mall, which included the leasing and stability of it. [*Id.*]. He stated that while the day-to-day operations rested with others, including Enderle, Feneck, Severs, and King, as things deteriorated, he "poked [his] nose in a little bit deeper as it went." [*Id.*

at 123-124].  Hauser further testified that in his business of commercial real estate having good and professional janitorial, maintenance, and security were important because "reputation is everything."  [*Id.* at 124].  He explained, "It is very hard to secure and monetize tenants and the uses around them unless you have a very good run operation."  [*Id.*].

At the time the Mall was purchased, Hauser described the operation to be "in pretty good shape…probably 80 percent occupied."  [*Id.*].  He added that most of the anchor tenants were there and that it was fairly well run.  [*Id.*].  When asked what happened to the Mall over time, Hauser explained that "everybody knows that malls have suffered through the last few years, but … the services at the mall declined."  [*Id.*].  Hauser stated that security was number one because it gets advertised and goes around by word of mouth.  [*Id.* at 125].  He explained that in the beginning, there were a lot of conversations with new tenants, some fairly significant, lots of letters of intent going back and forth, and a lot of meetings, "but as things degenerated over there, they were all finding excuses to not proceed forward, and it's really hard to get that back."  [*Id.*].  Hauser testified that there were a lot of security issues with the event venue, P. Reyes, to the point where police officers would be called almost every single night because of shootings, trash blowing in the parking lot, and intoxicated people running into each other in the parking lot.  [*Id.*].  He stated that he was directly involved in those issues and that there was very little support from Plaintiffs.  [*Id.* at 125-126].  Hauser testified that the above issues hurt their ability to market the Mall and that they lost a lot of negotiations at that point.  [*Id.* at 126].  He added that there was gunfire in the parking lot on a couple of occasions, which was reported in the media, and that it inhibited his ability to get future tenants.  [*Id.*].  With regard to janitorial services, Hauser stated that he heard from the Mall manager that services continued in cordoned off areas, which were unnecessary.  [*Id.*].

Hauser further testified that a major tenant, JCPenney, complained consistently and in fact terminated its lease. [*Id.* at 127]. When asked whether he ever had any discussions with anyone at ERMC or SecurAmerica regarding the issues, Hauser stated that he had a couple of conversations, though he did not recall them. [*Id.*]. He also stated that in reviewing invoices, it became clear over time that they were getting poor service, so "we just stopped paying them until we could get through the system." [*Id.* at 127-128]. Hauser testified that he agreed something was owed to Plaintiffs for the services they did provide and estimated a fair reduction would be approximately two-thirds of the claimed amount. [*Id.* at 128]. Hauser noted that they hired Avison and Young for 25% of security and 30% of janitorial costs, after ERMC was terminated or left. [*Id.*].

On cross-examination, Hauser could not say whether the onus of designing security was on the owner under the terms of the contract, but he was aware that security was unarmed. [*Id.* at 129]. In terms of it being observe and report, Hauser stated that he thought of that "in a real-time fashion to us and the police department," but was not aware of that being specified in the contract. [*Id.*]. He was also not aware of Defendant ever considering the idea of increasing security. [*Id.*]. Hauser acknowledged that part of the process of getting the total amounts billed reduced from $60,000 to $45,000 between March and November 2017 included a further reduction in services, which may have included security. [*Id.*]. When asked about the reduced charges of Avison and Young, Hauser acknowledged that such charges were for the services at the time of the transition due to downsizing of the Mall, which resulted in a reduction of security service given that the secured area needing to be patrolled was also reduced. [*Id.* at 131]. Hauser did not present any evidence of bills from Avison and Young. [*Id.*]. He testified that he heard the testimony

23

concerning Plaintiffs' acquiesce to a reduction as part of the assignment and again in May 2018, but added that he did not participate in the paperwork. [*Id.*].

## III.    ANALYSIS

The Court will begin with an overview of the relevant law and then turn to its findings of fact and conclusions of law.

### A.    Overview

Plaintiffs' claims against Defendant rest in damages for breach of contract. The parties do not dispute that Tennessee law is applicable. In Tennessee, a breach of contract claim has three elements as follows: "(1) existence of an enforceable contract, (2) nonperformance amounting to a breach of contract, and (3) damages caused by the breach of contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.,* No. 01A01-9511-CV-00513, 1998 WL 960287, at *4 (Tenn. Ct. App. Feb. 2, 1998)) (other citations omitted). Further, in determining whether a breach of a contract is "material," Tennessee courts have adopted the following factors:

> (1) The extent to which the injured party will be deprived of the expected benefit of his contract;
>
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

24

*Gerulis v. Jacobus*, No. M200900886COAR3CV, 2010 WL 1644991, at *6–7 (Tenn. Ct. App. Apr. 23, 2010) (other citations omitted).

"Damages in breach of contract cases are nothing more than payment in money for actual losses caused by the breach of contract." *Custom Built Homes,* 1998 WL 960287, at *4. Accordingly, the non-breaching party may not profit by the defendant's breach and is entitled to only those damages that would "put [him] in *the same position* he would have been in had the contract been performed." *Hennessee v. Wood Grp. Enterprises, Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991) (citations omitted) (emphasis in original).

Further, as a general rule, "damages are not permitted which are remote and speculative in nature." *Grantham & Mann, Inc. v. Am. Safety Prod., Inc.*, 831 F.2d 596, 601 (6th Cir. 1987) (quoting *Agricultural Services Ass'n v. Ferry–Morse Seed Co.,* 551 F.2d 1057, 1072 (6th Cir.1977)); *see also Kindred v. Nat'l Coll. of Bus. And Tech., Inc.*, No. W2014-00413-COA-R3-CV, 2015 WL 1296076, at *6 (Tenn. Ct. App. Mar. 19, 2015). "This rule serves to preclude recovery, however, only where the fact of damage is uncertain, *i.e.,* where the damage claimed is not the certain result of the wrong, not where the amount of damage alone is uncertain." *Grantham & Mann,* 831 F.2d at 601–02 (other citations omitted). "Once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Id.* (other citations omitted).

With the above guidance in mind, the Court turns to the facts presented in these cases.

### B. Findings of Fact

#### 1. STIPULATED FACTS

*The facts contained in this Section were stipulated to by all parties prior to trial* [Doc. 51 at 4–5]:

25

On October 7, 2016, Defendant entered into the Facilities Agreement with TriState. Under the Facilities Agreement, TriState agreed to provide certain janitorial and maintenance services for the Mall. In exchange for services rendered pursuant to the Facilities Agreement, Defendant agreed to pay TriState $477,618.98 per year,[12] exclusive of fuel costs and supplies. The Facilities Agreement required Defendant to make all payments required thereunder on a bi-weekly or monthly basis following the presentation of a statement setting forth the services rendered and all charges for the same.

On October 7, 2016, Defendant also entered into the Security Agreement with TriState. Under the Security Agreement, TriState agreed to provide certain unarmed observe and report only security services for the Mall. In exchange for Security Services, Defendant agreed to pay TriState $326,712.07 per year,[13] exclusive of fuel costs. The Security Agreement required Defendant to make all payments required thereunder on a bi-weekly or monthly basis following the presentation of a statement setting forth the services rendered and all charges for the same.

On November 28, 2017, TriState provided notice to Defendant that TriState had assigned its interest in the Security Agreement to SecurAmerica and the Facilities Agreement to ERMC and requested Defendant's consent thereto via the Consent Letter dated November 29, 2017. Defendant executed the Consent Letter and forward a copy of it to ERMC.

---

[12] Exhibit A to the Facilities Agreement originally provided that TriState would be paid $300,830.25 per year for janitorial services and $121,344.26 per year for maintenance services for a total of $422,174.51; however, per the Revised Exhibit A, which amended the Facilities Agreement on November 4, 2016, the amount to be paid to TriState for janitorial services increased to $356,274.72 per year, with the amount for maintenance services remaining unchanged - $121,344.26 per year – for a total of $477,618.98. [Exh. 1].

[13] Exhibit A to the Security Agreement originally provided that TriState would be paid $341,653.03 per year, plus fuel costs (billed at cost plus 10%); however, per the Revised Exhibit A, which amended the Security Agreement on November 4, 2016, the amount to be paid to TriState for security services reduced to $326,712.07, plus fuel costs. [Exh. 2].

Effective May 1, 2018, Defendant and ERMC entered into a Master Services Agreement Amendment Change Order (the "2018 Change Order"). The 2018 Change Order reduced (a) the number of "Budgeted Hours" allotted for janitorial services under the Facilities Agreement from 329.5 hours per month to 248 hours per month, and (b) the "Monthly Billing" from $19,327.68 to $15,195.63.

The Facilities Agreement and the Security Agreement contain identical attorney's fees provisions providing that the prevailing party in litigation is entitled to seek reimbursement of its attorney's fees and expenses from the losing party.

## 2. ADDITIONAL FINDINGS OF FACTS

After consideration of the witnesses' credibility and the admitted exhibits, the Court makes the following additional findings:

### (a) The Facilities Agreement

The Facilities Agreement provides as follows:

> 8. <u>Standards of Performance</u>. Contractor agrees to perform its services in a professional, timely, and conscientious manner and in compliance with all applicable federal, state, and local laws, ordinances, and regulations. Said services shall be performed at such hours and in such manner as not to interfere with the operation of the Property, the transaction of business thereon, or access by persons entitled to enter thereupon.
>
> . . .
>
> 10. <u>Failure to Perform</u>. Failure of Contractor to materially perform its duties, responsibilities or covenants in accordance with the terms of this Agreement may constitute breach hereunder. Owner may, at its option, without waiving such breach and without prejudice to any other rights it may have pursuant thereto: (i) notify Contractor of any deficiency in Contractor's performance and provide reasonable time for correction thereof; (ii) obtain an alternative contractor to perform the services or remedy Contractor's deficiency; or (iii) terminate this Agreement effective immediately upon notice thereof to Contractor.
>
> . . .

27

14. Notices. Whenever notice shall or may be given to either of the parties by the other, each such notice shall be registered or certified mail with return receipt requested, by telefax or email transmission (with a copy sent via first class mail) or by nationally recognized overnight courier, at the respective addresses of the parties as set forth in the preamble to this Agreement or to such other address as either party may from time to time designate in writing to the other.

[Exh. 1 at 3–4]. Exhibit B to the Facilities Agreement also outlines TriState's specific janitorial and maintenance services, which include "clean[ing] and maintain[ing] in a proper manner all common areas at the Property." [*Id.* at 7–9].

### (b) The Security Agreement

The Security Agreement provides as follows:

1. Services. Contractor agrees to provide security services for Owner at…(the "Property") in accordance with the terms and conditions set forth in this Agreement, and as further specified in the Exhibits hereto, which are incorporated herein by reference and made a part hereof.

   Contractor does not represent, warrant or guarantee that the services set forth in this Agreement will meet all of the security needs of the Property. All security services provided by Contractor will meet or exceed industry standards but the security services provided are based on the number of security hours and other security services approved by Owner and not based on any security assessment or recommended security hours provided by Contractor. Contractor has not been engaged as a security consultant with respect to the Property nor has Contractor been engaged to assess the design or construction of the Property, including without limitation parking for lighting. Contractor has been engaged only to perform the agreed upon services.

   . . .

2. Compensation. (a) Owner shall pay to Contractor the sum or sums set forth as compensation in Exhibit "A" attached hereto and made a part hereof and such additional sums as may be set forth in this Agreement as payable by Owner to Contractor. Such amounts shall be payable on a monthly basis as set forth herein, and payment shall be made following the presentation of a statement setting forth the servicers rendered and all charges for same. Contractor agrees to provide all services in a timely and professional manner.

. . .

8. <u>Standards for Performance</u>. Contractor agrees to perform its services in a professional, timely, and conscientious manner and in compliance with all applicable federal, state, and local laws, ordinances and regulations. Said services shall be performed at such hours and in such manner as not to interfere with the operation of the Property, the transaction of business thereon, or access by persons entitled to enter thereupon.

. . .

10. <u>Failure to Perform</u>. Failure of Contractor to materially perform its duties, responsibilities or covenants in accordance with the terms of this Agreement may constitute breach hereunder. Owner may, at its option, without waiving such breach and without prejudice to any other rights it may have pursuant thereto: (i) notify Contractor of any deficiency in Contractor's performance and provide reasonable time for correction thereof; (ii) obtain an alternative contractor to perform the services or remedy Contractor's deficiency; or (iii) terminate this Agreement effective immediately upon notice thereof to Contractor.

. . .

14. <u>Notices</u>. Whenever notice shall or may be given to either of the parties by the other, each such notice shall be registered or certified mail with return receipt requested, by telefax or email transmission (with a copy sent via first class mail) or by nationally recognized overnight courier, at the respective addresses of the parties as set forth in the preamble to this Agreement or to such other address as either party may from time to time designate in writing to the other.

[Exh. 2 at 1; 3–4]. The Security Agreement outlined TriState's specific services in Exhibit B as follows:

1. Contractor agrees to furnish an adequately trained unarmed security guard force as provided below.

2. Contractor agrees to provide the following, which are subject to review and approval by OWNER:

(a) A work schedule providing for such coverage as is required by Owner, together with supervisory assignments.

(b) Instructions designed to provide agreed upon coverage for all common areas of the Shopping Center, emphasizing that activity should be confined to non-tenant owned/leased/occupied store areas.

29

(c) Professional appearance, conduct, demeanor for Contractor's employees.

3.    Contractor agrees that the security services covered by this Agreement shall be performed in accordance with accepted security practices and standards as codified in applicable laws and regulations relating to licensed private security agencies. Contractor's performance of these services shall be in a professional, timely, and conscientious manner and shall not fall below the applicable standards recognized in the industry for such services.

[*Id.* at 8].

### *(c) The Assignment, Consent Letter and 2018 Change Order*

According to Feneck, in March 2017, the Mall was losing tenants as were malls in general, so Defendant closed off the upper level on the Sears' end of the Mall in order to reduce activity and make the Mall look less empty. Feneck testified that at that time, he made an initial request for a reduction in contract costs, targeting about $45,000 a month, but that he did not have specific communications with Camp concerning the reduction request until November 2017 when the Assignment was in the works. As indicated by Exhibit 4, Defendant executed the Consent Letter, dated November 29, 2017, agreeing to the assignment of the Facilities Agreement and Security Agreement. The Consent Letter also states, "By making this request, we and SecurAmerica (as our successor) acknowledge and agree that fees to be paid by you to SecurAmerica shall be reduced from $60,000 per month to $45,000 per month." The monthly billings under the Service Contracts were reduced to approximately $21,000 per month under the Security Agreement and approximately $24,000 per month under the Facilities Agreement. While the Facilities Agreement and Security Agreement were assigned to ERMC and SecurAmerica, respectively, all of TriState's accounts receivable, regardless of which contract they accrued under, were assigned to SecurAmerica in accordance with the Assignment.

Supported by the testimony of Maynord, the evidence demonstrated that Defendant was invoiced monthly for services rendered pursuant to the Facilities Agreement and the Security Agreement. Defendant made partial payments on the November and December 2017 invoices; however, Defendant made no payments for services at any point after December 2017. In May 2018, pursuant to another request from Defendant, the parties entered into the 2018 Change Order, reducing services and pricing under the Facilities Agreement as previously noted. Adjustments to the billings were made in accordance with the 2018 Change Order.

Finally, by letter dated August 29, 2019, Plaintiffs' counsel provided Defendant a thirty (30) days' notice of termination of the Facilities Agreement and the Security Agreement, informing Defendant that no additional services would be provided after 5:00 PM (ET) on September 29, 2019.

### (d) The Parties' Performance under the Service Contracts

Maynord testified that Plaintiffs performed their obligations under the Service Contracts in a professional, timely, and in a conscientious manner and that he was unaware of a notice ever having been provided by Defendant to ERMC or SecurAmerica regarding any performance deficiency under the Service Contracts. Maynord also explained the content of Plaintiffs' invoices that were submitted to Defendant. For instance, with respect to ERMC's invoices, he testified that the invoices showed the amounts billed for janitorial and maintenance services and the amounts billed for fuel and supplies, including the 10% markup, all in accordance with the parties' contract. In addition, with respect to Plaintiff SecurAmerica's invoices, Maynord testified to the content of the invoices, which reflect the amounts billed to Defendant in accordance with the parties' agreement.

Defendant presented the testimony of Feneck, Enderle, and Hauser that certain performance deficiencies resulted in complaints from the major Mall tenants. Specifically, Feneck testified to the following issues with the services provided by ERMC: (i) lack of cleanliness in the food court, restrooms and at mall entrances, (ii) failure to timely empty trash cans, (iii) failure to timely change light bulbs on exterior parking lights; and (iv) failure to paint exterior canopy poles at the movie theatre entrance upon request. Both Feneck and Enderle stated that Chick-fil-A, the largest anchor tenant in the food court, was unhappy with ERMC's responsibility for cleanliness of the bathrooms and tables in the food court area. With respect to SecurAmerica, Feneck testified that the services were deficient and failed to provide an adequate level of detail concerning a fight that occurred in the food court area on May 10, 2017. Enderle added that there were also issues with vandalism of vehicles in the Mall parking lot. Enderle stated that these events ultimately caused negative publicity for the Mall that hindered Defendant's ability to retain current tenants and obtain new tenants. Hauser testified as to incidents in the Mall's parking lot outside of a night club that consistently resulted in gun fire, excessive trash in the parking lot, and intoxicated patrons congregating in the parking lot. He also testified that the subpar janitorial, maintenance, and security services led to the Mall receiving negative press and subsequent tenant retention issues, specifically noting that JCPenney complained about the services and ultimately terminated its lease at the Mall.

On cross-examination, Enderle acknowledged that he had no documented evidence that any tenant left the Mall because of ERMC's services or any negative correspondence with tenants about service issues. Feneck testified on cross-examination Severs was responsible for communicating with ERMC concerning deficiencies in janitorial services and that he was unaware

of whether Plaintiffs were provided with written notice of any such deficiencies. Lastly, while Hauser asserted that SecurAmerica's security services fell below the requisite standard established by the Security Agreement, he acknowledged on cross-examination that he was unfamiliar with the terms of the Security Agreement.

### (e) Damages

According to the invoices and testimony presented at trial, the amount due and owing to SecurAmerica was shown to be $503,907.27, calculated as the amount reflected in SecurAmerica's ledger less the overbilled portion of Invoice No. 07004 in the amount of $1,245.08. The amount due and owing to ERMC was established to be $439,746.63, calculated as reflected in ERMC's ledger. Defendant's witnesses did not challenge the validity of the invoices or the accuracy of the amounts reflected in the invoices.

Hauser was the only witness to testify on behalf of the Defendant as to a reduction or offset in damages it claimed as an affirmative defense. Hauser's testimony acknowledged that Defendant owes Plaintiffs some amount for the services provided but estimated a fair reduction of approximately two-thirds of the claimed amount. In estimating the reduction, Hauser noted that Defendant hired Avison and Young for 25% of security and 30% of janitorial costs after the termination of the Service Contracts, acknowledging there had been a downsizing of the Mall resulting in a reduction in the need for service. Hauser presented no evidence of bills or other contractual documentation from Avison and Young.

### C. Conclusions of Law

Under Tennessee law, the essential elements of a breach of contract claim "include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract,

and (3) damages caused by the breach of contract." *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007) (citations omitted).

It is evident that Plaintiffs have established all three elements in this case. First, the Facilities Agreement and the Security Agreement were valid contracts existing between Plaintiffs and Defendant, and there is no factual dispute calling into question the Assignment Agreement, the Consent Letter, or the 2018 Change Order. Second, Plaintiffs submitted invoices sufficiently describing the services rendered and all charges for the same to Defendant in accordance with the parties' Service Contracts, and Defendant stopped making payments owed to Plaintiffs under the Service Contracts, resulting in a breach of the Service Contracts. Lastly, there were damages caused by the breach in that Plaintiffs did not receive the fees they were owed.

Here, the only matter in dispute is the amount of damages owed to Plaintiffs as Defendant attempts to avoid a portion of liability on the Service Contracts by asserting as an affirmative defense that Plaintiffs failed to satisfactorily perform services under the Service Contracts, entitling Defendant to an offset or reduction against the full claimed amount of damages.[14]

The Court finds Defendant is not entitled to an offset. Specifically, the Court finds that Defendant has failed to establish that Plaintiffs' performance under the Service Contracts fell below standards as to give rise to a reduction, credit, or offset. In its Proposed Conclusions of Law, Defendant asserts the following: "Defendant has the right to offset any damages for services that were not performed in accordance with the terms and provisions of the Contracts at issue."

---

[14] The Court notes that in the Agreed Pretrial Order [Doc. 51], Defendant also stated that the security services were provided by Plaintiff ERMC and not Plaintiff SecurAmerica, and therefore, Plaintiff SecurAmerica is not entitled to payment for services that it did not supply. It is not clear if Defendant has abandoned this theory, as it is not asserted in its Proposed Findings of Fact and Conclusions of Law [Doc. 63]. In any event, during the trial, while Defendant disputed the sufficiency of Plaintiff SecurAmerica's security services, there was no evidence to suggest that Plaintiff SecurAmerica failed to provide such services.

34

[Doc. 63 at ¶ 61]. In other words, it appears to the Court that Defendant alleges Plaintiffs breached the Service Contracts. The Court disagrees with Defendant's position for several reasons. First, Defendant has not pointed to the specific "terms and provisions," [*id.*], for which Plaintiffs have not complied.[15] "[I]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 752 (M.D. Tenn. 2015) (citing *Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.,* 492 F. App'x 518, 522 (6th Cir. 2012)) (other quotations omitted).

Second, despite Defendant not specifying the specific term and provision that Plaintiffs breached, the Court observes that both Service Contracts contain a provision discussing the standards of performance, wherein Plaintiffs agreed to perform their services in a professional, timely, and conscientious manner. The Court, however, finds that Defendant did not sufficiently show that Plaintiffs failed to perform their obligations in a professional, timely, and conscientious manner. For instance, Defendant presented the testimony of Enderle, who testified that two tenants, Chick-fil-A and the Japanese steakhouse, complained "on several occasions" regarding the cleanliness of the food court and bathrooms. [Doc. 59 at 95]. Enderle also testified that Chick-fil-A had "many discussions" with King about terminating its lease due to such issues. Enderle's testimony, however, was vague with respect to the quantity of the complaints, and more importantly, Enderle was not involved in the discussions with Chick-fil-A, so it is unclear what was the specific nature of Chick-fil-A's complaints, other than uncleanliness.

---

[15] The Court also notes that Defendant's allegations could be deemed futile for failing to identify the specific "terms and provisions" of the Service Contracts for which Plaintiffs allegedly did not comply. *See Berry v. Regions Fin. Corp.*, 507 F. Supp. 3d 972, 980 (W.D. Tenn. 2020), *appeal dismissed*, No. 21-5038, 2021 WL 1511687 (6th Cir. Jan. 29, 2021) (finding breach of contract claims in a proposed amended complaint futile for failure to identify the breached contract or provision of contract).

While Feneck's testimony regarding the janitorial and maintenance services was more detailed than Enderle's testimony, the Court does not find Feneck's testimony supports a material breach of the Service Contracts. For instance, Feneck generally discussed the issues that Chick-fil-A complained of and that Feneck personally observed dirty tables and trash cans not being emptied. In addition, Feneck stated that he pointed out to the Mall manager, Severs, that there were maintenance issues in the restrooms, issues with the lights in the parking lot, and poles that needed to be painted. Further, Feneck testified that the restrooms were a "constant issue." The Court finds Feneck's testimony too vague to conclude that such issues created a material breach of the Service Contracts. Similar to the above finding, Feneck did not testify regarding the quantity of the complaints and how many times Feneck personally observed the above issues. While he stated that the restrooms were a "constant issue," he did not sufficiently explain what the "constant issue" was and whether Plaintiffs were able to remedy, or had the obligation to remedy, the "constant issue."

With respect to the security services, Enderle mentioned that vehicles in the Mall's parking lot were vandalized and there were some fights on the property. The Court finds, however, that Defendant did not establish that such issues were the result of Plaintiff SecurAmerica's deficient performance under the Security Agreement. Feneck testified that there was a significant altercation in the food court and that Plaintiffs did not timely and sufficiently report the incident to him. Defendant, however, did not produce the alleged deficient and untimely report. Thus, while Feneck called the report "bland" in comparison to the altercation, he did not provide an explanation of what the report should have included, and because the Court does not have a copy of the report, the Court cannot conclude that it was "bland." Further, even if the report was introduced at trial and entered into evidence, and it indeed was deficient and untimely, the Court

finds that it would not constitute a material breach of the contract based on Defendant's failure to articulate what term and provision this one action would have breached. Finally, Hauser testified that there were security issues with the event venue, P. Reyes, and that he received little support from Plaintiffs, but he failed to testify what support he needed from Plaintiffs and whether Plaintiff SecurAmerica was responsible for the security issues relating to P. Reyes.

Third, both Service Contracts provided that if Plaintiffs failed to perform their duties or responsibilities, Defendant may, without waiving such breach, (1) notify Plaintiffs of the deficiency and provide a reasonable time to correct the deficiency, (2) obtain an alternative contractor to perform the deficient services, or (3) terminate the Service Contracts. Defendant did not avail itself to any of the remedies that the Service Agreements provided. While there was some testimony that Defendant brought to Plaintiffs' attention some maintenance, janitorial, and security issues, there was no testimony that Defendant provided the requisite written notice of such deficiencies via certified mail or telefax/email transmission (with a copy sent via first class mail) or provided Plaintiffs a reasonable time to correct the deficiencies. Instead, the parties testified that they were not aware of any written communications that would comply with the above requirements.

Finally, even if the Court found that Defendant was entitled to an offset, Defendant's offset amount is wholly speculative. In Defendant's Proposed Conclusions of Law, it provides as follows:

> That since the Defendant was able to find replacement cost for the services provided by the Plaintiffs at an amount equal to 30% of the costs charged by the Plaintiffs, and because the Plaintiffs failed to provide services in the manner prescribed by their own contracts, the amount due and owing by the Defendant to the Plaintiff ERMC is hereby reduced from the claimed amount of $439,746.63 to $131,923.99, and the amount due and owing by the Defendant to the

37

Plaintiff Securamerica is reduced from the claimed amount of $505,152.35 to $151,5545.71.

[Doc. 63 at ¶ 63]. Hauser testified that Defendant hired Avison and Young for 25% of security and 30% of janitorial costs. Defendant, however, did not produce its contract with Avison and Young, and there was no evidence that Avison and Young performed the same services as Plaintiffs. Further, Hauser testified that when Defendant entered into its contract with Avison and Young, the Mall had downsized. Accordingly, for the reasons explained above, the Court finds Defendant has not established that it was entitled to an offset.

## IV. CONCLUSION

Accordingly, for the reasons explained above, the Court **FINDS** that Defendant breached the Service Contracts by failing to pay the amounts due thereunder. The Court further **FINDS** that the evidence presented at trial established that the amounts due and owing under the Service Contracts are $503,907.27 to SecurAmerica, calculated as $505,152.35 minus $1,245.08 in overbilling for portion of Invoice No. 07004, and $439,746.63 to ERMC. Finally, the Court **FINDS** Plaintiffs are entitled to their reasonable attorney's fees. The Court **ORDERS** Plaintiffs to file their motion for attorney's fees pursuant to Rule 54(d) within thirty (30) days of the Judgment being entered.

A separate Judgment will enter.

ORDER ACCORDINGLY:

Debra C. Poplin
United States Magistrate Judge